Townsend Cox et al., Appellants, *v.* Edward S. Stokes et al., Respondents.

156 491
161 357
156 491
f164 49
156 491
170 ⁵259

1. Appeal — Parties Bound by Findings of Fact. On appeal from a judgment on a trial by the court, parties who have not appealed are bound by the findings of fact made by the trial court; while the appellants are bound by all to which they did not except and, after an affirmance by the General Term, by all even of those excepted to that find any reasonable support in the evidence.

2. Corporation — Consideration for Promise by Holder of Receiver's Certificates to Perform Reorganization Agreement. A promise by a holder of receiver's certificates to perform a corporation reorganization agreement not signed by him, founded on the consideration that his certificates, as to which serious questions existed that were pending in the courts, should be validated by an amendment of the decree in foreclosure of the corporation mortgage, is upheld and rendered binding, by the prompt making of the amendment by the consent of the parties to

the agreement through the reorganization committee, and the discontinuance, through the same agency, of the litigation to test the validity of the certificates.

3. ACTION FOR RELIEF FROM VIOLATION OF REORGANIZATION AGREEMENT — THEORIES OF DEFENSE. The theories advanced in defense of an action by bondholders for relief from the violation of a corporation reorganization agreement — that there was a rescission of the agreement, that there was a lawful modification of the agreement, that there was a ratification by the plaintiffs of the modification, and that there was such *laches* on their part as to defeat their cause of action — examined and found not sustained by either the law or the facts.

4. RESCISSION. Effective rescission requires a lawful right to rescind, due notice of an intention to rescind and the restoration of benefits received by the party attempting to rescind, so that the other party may be placed in *statu quo.* Even if the most complete right of rescission exists it cannot be exercised without a return or an offer to return such benefits.

5. MODIFICATION OF REORGANIZATION AGREEMENT. Where the powers of a corporation reorganization committee are defined and limited by the reorganization agreement, they cannot of themselves change or dispense with an express stipulation of the agreement.

6. RATIFICATION OF MODIFICATION OF REORGANIZATION AGREEMENT. A ratification, by a bondholder, of a modification of a reorganization agreement by the reorganization committee is not established, where there is no evidence that the bondholder intended to forego any advantage or to surrender any right, and nothing was done by him inconsistent with the existence of the rights conferred by the original agreement, or with his intention to rely thereon, and there was no consideration, intent, misleading conduct, change of position or mutual understanding from which a waiver or estoppel can properly be inferred.

7. LACHES. Whether the equitable doctrine of *laches,* as distinguished from the Statute of Limitations, now exists in this state, is open to serious doubt.

8. LACHES OF PARTIES TO REORGANIZATION AGREEMENT. Where a corporation reorganization agreement is signed by many different parties, it is not necessary that each should sue in order to preserve his rights. Suit by one of a class, in behalf of all, relieves from the imputation of *laches.*

9. RELIEF OF BONDHOLDERS. Where it is apparent that bondholders who have signed a reorganization agreement are entitled to some relief from a violation thereof by the defendants in an action instituted on their behalf, a dismissal of the complaint upon the merits is improper, even though it appears that the relief will probably prove of slight value, and that specific performance of the rights of the bondholders cannot be had in justice to third parties.

*Cox* v. *Stokes,* 78 Hun, 331, reversed.

(Argued June 17, 1898; decided October 4, 1898.)

APPEAL from a judgment of the late General Term of the Supreme Court in the first judicial department, entered April 10, 1895, affirming a judgment in favor of defendants entered upon a decree of the court dismissing the complaint upon the merits on trial at Special Term.

This is a representative action brought in behalf of the plaintiffs and all others similarly situated. Upon the trial it appeared that in the spring of 1885 the Bankers & Merchants' Telegraph Company owned a large number of poles, and many miles of wire thereon ; that it had also strung many miles of wire upon poles of the American Rapid Telegraph Company, under a lease, and was in possession and use of the same; that through the ownership of a controlling interest in the " stocks " of a large number of small telegraph companies it controlled their lines, and that all these wires, comprising in the aggregate over 45,000 miles, were blended into a single harmonious and extensive system of telegraph communication throughout many different states. Its property and franchises, however, were subject to two mortgages. The first, known as the divisional mortgage, was executed July 2, 1883, to the Farmers' Loan & Trust Company, as trustee, to secure three hundred bonds of $1,000 each, all of the principal of which was unpaid, and there was a default in the payment of interest, with a suit pending to foreclose. The second mortgage, known as the general mortgage, was given November 24, 1883, to the same trustee, to secure ten thousand bonds of $1,000 each, of which there had been issued over $7,000,000 in amount prior to April, 1885. This mortgage was a first lien upon the shares of stock issued by the subsidiary lines and owned by the parent company. The plaintiffs, since July, 1884, have owned and represented general mortgage bonds to the amount of $731,000.

The company had been embarrassed since July, 1884, by judgments obtained against it and levies made upon its property. In September of that year an action was begun by one Day, a judgment creditor, with execution returned unsatisfied, to sequestrate its property, and on the 24th of that month

receivers were appointed therein, but without notice to the trustee for the bondholders. On January 6, 1885, at the suit of one De Haven, the same persons were appointed receivers, in an action brought solely for that purpose, of all the property and assets of the company, and authorized to issue receiver's certificates to an amount not exceeding $1,500,000, which were declared a lien upon all the property, real and personal, prior and paramount to the general mortgage, but subject to the divisional mortgage. No certificates were issued under this judgment, but under separate orders, obtained *ex parte*, certificates were issued to the amount of $602,802.06, some for money borrowed in the Day suit, some to pay an old debt of the company to one Sully, and the others for various purposes, including the payment of money borrowed privately by the receivers without the authority of the court. Certificates amounting to $130,000 were issued in the Day suit, which were claimed to constitute a lien upon certain lines in Ohio, Pennsylvania and Indiana. The defendant Stokes acquired those certificates and those issued to Mr. Sully and others, to the amount in all of about $600,000. The issue of these certificates had been questioned in many ways, and an appeal was pending from a determination sustaining their validity.

On the 22nd of April, 1885, the Farmers' Loan & Trust Company, at the request of many bondholders, including the plaintiffs, who alone deposited $1,500 to secure the trustees' costs and expenses, commenced an action to foreclose the general mortgage, and in May following John G. Farnsworth was appointed receiver therein and directed to carry on the business of the company. This receivership was extended over all previous receiverships, without prejudice to the orders and proceedings in the Day and De Haven suits, and General Farnsworth qualified as receiver in the three actions. In June, 1885, judgment of foreclosure and sale was entered in the action last named.

At about this time it was discovered that all of the wires strung on poles of the American Rapid Telegraph Company

were claimed by it as its absolute property, and that there were liens on the subsidiary lines in several states, including a judgment in the state of Illinois for about $85,000. At about this time also a mortgage trustee commenced an action against the American Rapid Telegraph Company to foreclose a mortgage for $3,000,000 on its property, claiming that the title to the strung wires and to certain western lines was in that company and not in the Bankers & Merchants.

In this state of confusion and danger, negotiations were commenced by the holders of the general mortgage bonds to protect their interests, the plaintiffs and their counsel taking the leading part. Mr. Stokes, who held receivers' certificates to a large amount and $500,000 in general mortgage bonds, was frequently interviewed by one of the plaintiffs with reference to such action as might be advisable to protect the interests of all concerned. On the 25th of May, 1885, the negotiations culminated in a contract known as the reorganization agreement, which was signed by the plaintiffs and many other bondholders. This agreement, which was drawn at the express request of Mr. Stokes, recognized the receivers' certificates as valid, and provided that the holders thereof should advance the money needed for reorganization and take in return therefor and for their certificates first mortgage bonds of a new company to be formed, dollar for dollar, and that the general mortgage bondholders should receive second mortgage bonds of said company at the rate of fifty per cent on the principal of their old bonds. Both these issues of bonds were to be secured by mortgages upon all the property of the old company, including the "stocks" held by it in the subsidiary companies. A committee of four was appointed to carry out the agreement, and they were to purchase the property of the company under decree in foreclosure, cause a new company to be incorporated with a capital stock of $3,000,000, and convey all the property to it in consideration of a first mortgage upon the same property, executed by the successor company to secure an issue of not more than $1,200,000 of bonds, and a second mortgage on all the property to secure

an issue of not more than $3,600,000 of bonds. The commit-
tee was authorized to dispose of the first mortgage bonds by
exchanging them for the purpose of discharging, dollar for
dollar, the outstanding receivers' certificates, to raise money to
carry out the plan of reorganization, and, if deemed expedient,
to discharge the prior divisional mortgage. They were
directed to deliver to the general mortgage bondholders on
the surrender of their bonds one new second of $500 for an
old general mortgage bond of $1,000. They were authorized
to borrow money to carry out the plan, and to secure the loan
by the delivery of first mortgage bonds and such a proportion
of the capital stock of the successor company as they should
deem meet. The stock of the new company was to be
exchanged for the stock of the old company at the rate of one
dollar of the new for four dollars of the old.

Any of the first and second mortgage bonds, or shares of
capital stock not thus used, the committee were authorized to
sell or dispose of in such manner as they saw fit and to turn
the proceeds, after deducting expenses, over to the successor
company for its use and benefit. The committee were consti-
tuted attorneys to execute, on behalf of the bondholders, any
agreement to enable them to carry out their said trust, and
were clothed with "whatever power it may be suitable for
them to exercise in order to enable them to legally and effici-
ently execute their trust," and with full discretion as to all
matters not specifically covered by the agreement.

Mr. Stokes did not sign this instrument, but, on the 3d of
June, 1885, he promised the plaintiffs and other bondholders,
as well as the committee, one of whom was his own nominee
and another the nominee of Mr. Sully, to carry it out and
to furnish and advance all the money necessary therefor, and
accept in consideration thereof first mortgage bonds of the
successor company for his receivers' certificates, dollar for
dollar, and for the cash furnished, and $2,250,000 of the stock
of the new company. This promise was made by Stokes on
the condition that a majority of the general mortgage bond-
holders should execute the agreement, recognize the validity

and prior lien of the receivers' certificates, and procure the same to be made valid in the decree of foreclosure. The attorneys for the plaintiff in the foreclosure suit refused to amend the decree in that respect until requested to do so on behalf of a majority of the bondholders. Prior to June 9, 1885, a majority of the general mortgage bondholders became parties to the reorganization agreement, and at about that date the committee, then representing a majority of the general mortgage bonds, requested the attorneys for the plaintiff in the foreclosure action to so amend the decree as to validate the receivers' certificates, and on the 12th of June the decree was amended by consent accordingly. Thereupon said attorneys withdrew the appeal taken from the decree in the De Haven suit at the request of the reorganization committee, the plaintiffs and the general bondholders, and the litigation to test the validity of the receivers' certificates was wholly discontinued and terminated. Pursuant to this arrangement Stokes agreed to buy the property at the foreclosure sale for the reorganization committee and in accordance with the plan agreed upon and to furnish all the cash needed for the purpose and to receive first mortgage bonds of the new company therefor.

At all times prior to the sale in foreclosure it was understood by all parties in interest that Mr. Stokes would purchase the mortgaged property for and on behalf of the reorganization committee and carry out the reorganization agreement. He orally promised the committee to carry out that agreement, and about the 20th of June he promised to execute an instrument in writing embodying his prior oral agreement, but he failed to do so although duly requested by the counsel for the reorganization committee on July 27th, 1885.

On the 10th of July, 1885, the telegraph wires of the Bankers & Merchants' Telegraph Company, throughout many states, were by force cut and disconnected by a rival, known as the Western Union Telegraph Company. In addition to this misfortune, claims were made against it, which, if successful, would have rendered its property of no value. After

63

the wires were cut Stokes stated to his own counsel in the presence of the chairman of the reorganization committee, in a very informal manner, that he could not carry out his oral agreement. There was no other effort at rescission, and the committee took no action. Subsequently a modification was arranged between Stokes and the committee without the knowledge or consent of the bondholders. Those most interested knew nothing about it until after the sale when the opportunity to bid had passed by.

At the foreclosure sale, which took place July 31, 1885, Mr. Stokes bid in the property for $500,000, and at once assigned his bid to the United Lines Telegraph Company with the consent of the reorganization committee. In part payment of his bid he used $317,000 of his receivers' certificates. The court found that $500,000 was an adequate consideration for the property, which Stokes claimed to purchase on his own account, but this claim was at once disputed. His real purpose was to turn over the property to the new company upon the request of the reorganization committee as soon as the details of the modified agreement could be settled. The dismembered condition of the property and the numerous breaks in the lines had much reduced its selling value; still the court found that the first mortgage bonds of the new company, amounting to $1,200,000, were worth par. The modified agreement, arranged sometime before but not formally entered into until August 7th, between the reorganization committee, the United Lines Telegraph Company and Mr. Stokes, while not signed by said company or by Stokes, was carried out by him, and, as the trial judge found, it "was made in good faith in law." The only actual signers were the members of the committee. After referring to the plan of reorganization, the sale of July 31st and the purchase by Stokes, and reciting that he had agreed with the committee that if he should purchase the property he would turn it over to the United Lines Telegraph Company, which was the name of the new company organized to take the property, it provided that the referee at the foreclosure sale should convey the property to the United Lines Company,

which, in consideration thereof, was to deliver to Stokes $900,000 in first mortgage bonds to be issued by that company, and $2,250,000 of its stock. This was an increase of about $200,000 in the amount of bonds. He was to deliver to the reorganization committee the second mortgage bonds mentioned in the reorganization agreement and $750,000 in stock to be distributed by the committee according to that agreement, and it was also agreed that the United Lines Telegraph Company might " dispose of any stock or bonds of any other company purchased by " Stokes at the sale " upon such terms as it may deem proper, using the proceeds for the benefit of itself." This withdrew the stocks which controlled the subsidiary lines from the security to which the general mortgage bondholders were entitled under the reorganization agreement. These stocks were intended to be used, and were in fact used, to give Mr. Stokes additional collateral for advances made by him. The bondholders were not informed of this action, which seems to have been intentionally kept secret for the time being. Written notice was promptly given to each member of the reorganization committee that the agreement of August 7th, 1885, was beyond the powers of the committee and in violation of the terms of the reorganization agreement, and the fact of such notice, which was in the form of advice through a letter from their own counsel, was at once communicated by the members of the committee to the counsel for Mr. Stokes. After the sale the committee continued to publish in the newspapers an advertisement stating that the bondholders might continue to deposit their bonds under the reorganization agreement with the same effect as theretofore. The counsel for the reorganization committee opposed the execution of the modified agreement by the committee and protested against it, but without avail. On the 28th of August, 1885, the Roebling Sons Company, who had signed the reorganization agreement, brought a suit, which was still pending and undetermined when this action was commenced, against the present defendants to set aside the agreement of August 7th as fraudulent and void, and praying that they be

compelled to perform the original agreement. The referee's deed in foreclosure was delivered to the United Lines Telegraph Company at the request of Mr. Stokes on the 14th of November, 1885, but it was not until April 4, 1887, that the referee's report of sale was actually filed, and in the meantime several motions had been made to set aside the sale. This action was commenced on the 15th of April, 1887, on the theory that the modification of the original agreement with the reorganization committee was void as against the power of the committee; that Stokes should be deemed to have bought in the property pursuant to the original reorganization agreement; that he should account to the bondholders for his transactions with reference to the same since that time, and that the securities representing the control of the subsidiary companies, which formed the connecting links in the system, should be brought under the lien of the mortgages of the new company in accordance with the first agreement.

Mr. Stokes has complied with the provisions of the modified agreement and has made advances to preserve the property exceeding the par value of the additional bonds and stock of the United Lines Telegraph Company allotted to him. The first and second mortgages executed by that company through himself, as its president, excepted from the lien thereof the stocks and securities of the subsidiary lines owned by the Bankers & Merchants' Telegraph Company, as permitted by the modified, but prohibited by the original reorganization agreement. These excepted securities were not worth, when sold separately, as much as the difference in the value between the bonds and stocks issued to Stokes and the aggregate of his receivers' certificates and advances. They were, however, as portions of a complete system of telegraphic communication, worth more when the agreement of August 7th was entered into, and said mortgages were executed by the United Lines Telegraph Company. The latter was without funds and was operating its system at the loss of $10,000 a month. It had no available assets to meet the deficit other than said stocks and securities. Both Stokes and the United Lines

Telegraph Company, since the deed of August 10th, 1885, have so dealt with the property as to materially increase and appreciate its value. About February 13, 1886, bonds of the United Lines Telegraph Company, amounting at par to $900,000, were delivered to Stokes, and are now held and owned by him, but neither he nor said company have performed the reorganization agreement and no second mortgage bonds, as therein provided for, have been issued or delivered to the general mortgage bondholders, who, thus far, have received nothing for their bonds, and their rights seem to have been substantially ignored by the committee.

The trial court found "that within about three days after the modified agreement of August 7th the plaintiff, Townsend Cox, expressed to the defendant Stokes the desire to get back $2,000, which he, Cox, had advanced to receiver Farnsworth, and that thereupon defendant Stokes sent $2,000 to receiver Farnsworth, who, therewith, repaid the said advance of $2,000 to the plaintiff, Townsend Cox, and that thereby the plaintiffs, Townsend Cox and Townsend Cox, Jr., actively affirmed each and all of the acts of the reorganization committee in the premises." The trial court also found "that the plaintiff, Frederick P. Olcott, held four hundred and eighty of the bonds originally held as collateral security by the plaintiffs, Townsend Cox and Townsend Cox, Jr., as a substituted pledge and as collateral to $80,000 of notes which had not actually matured on the 7th of August, 1885, and said Olcott failed to show when he first learned of the settlement of the 7th of August, but it is admitted that he did learn the particulars of said settlement, and there is no evidence tending to show that he, within a reasonable time, brought any action to set aside or vary the same, although he knew that large sums of money were being advanced by said Stokes and contracts made by reason of said settlement."

Upon these and many other facts found by the court at Special Term, the complaint was dismissed on the ground of ratification and *laches*, but without costs. The judgment was affirmed by the General Term upon the ground that the notifi-

cation by Stokes to the committee that by reason of the changed condition of the property he would not carry into effect his oral agreement, was notice to the bondholders, and that they were bound to accept either their *pro rata* share of the purchase price arising upon the sale in foreclosure, which was more than absorbed by the receivers' certificates, or the terms of the new reorganization agreement. From the judg-- ment of the General Term the plaintiffs appeal to this court.

*Joseph H. Choate, William D. Guthrie* and *Charles Steele* for appellants. There was a valid oral contract prior to the 10th of July, 1885, between Stokes and the reorganization committee. (*Met. Trust Co.* v. *Tonawanda Valley & C. R. R. Co.*, 103 N. Y. 245, 248; *Raht* v. *Attrill*, 106 N. Y. 423, 431; *Hun* v. *Cary*, 82 N. Y. 65, 72; *Marie* v. *Garrison*, 83 N. Y. 14, 26; *Beckwith* v. *Brackett*, 97 N. Y. 52, 55.) There was no rescission of the contract. (*Brewster* v. *Wooster*, 131 N. Y. 473, 477; *Kley* v. *Healy*, 149 N. Y. 346, 354.) The reorganization committee had no power to modify the oral contract and the reorganization agreement as attempted to be done in the agreement of August 7, 1885. (*Livingston* v. *Lynch*, 4 Johns. Ch. 573; *Const* v. *Harris*, Turn. & R. 524; *Abbott* v. *Johnson*, 32 N. H. 9; *Martin* v. *Farnsworth*, 49 N. Y. 555, 558; *Bear* v. *Am. Rapid Tel. Co.*, 66 How. Pr. 274; *Anderson* v. *Coonley*, 21 Wend. 279; Story on Agency, § 517.) The plaintiffs did not ratify the agreement of August 7, 1885. (*McKnight* v. *Dunlop*, 5 N. Y. 537, 544; *Bennecke* v. *Ins. Co.*, 105 U. S. 355, 359; *Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 136, 164; *Belknap* v. *Bender*, 75 N. Y. 446, 453; *Hinkley* v. *Crouse*, 125 N. Y. 730, 731; *F. L. & T. Co.* v. *B. & M. T. Co.*, 119 N. Y. 15, 23; *Colt* v. *Miller*, 10 Cush. 49; *Palmer* v. *Sawyer*, 114 Mass. 1; 1 Chitty on Pleading [16th Am. ed.], 335; *Baldwin* v. *Munn*, 2 Wend. 399; *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267; *Curtis* v. *Leavitt*, 15 N. Y. 9, 194; *Johnson Co.* v. *Thayer*, 94 U. S. 631, 644.) There have been no *laches* upon the part of the plaintiffs. (*Derby* v. *Yale*, 13 Hun, 273; *Galway* v.

*M. E. R. Co.*, 128 N. Y. 132, 153 ; *Archibald* v. *Sully*, 9 H. L. Cas. 360, 383 ; *R. R. Co.* v. *Bowles' Heirs*, 9 Bush, 468, 493 ; Wood on Lim. 62 ; 2 Perry on Trusts [3d ed.], § 896 ; *Boardman* v. *L. S. & M. S. R. Co.*, 84 N. Y. 157.) Stokes and the United Lines Telegraph Company are chargeable as trustees *ex maleficio*. (*Matter Will of. O' Hara*, 95 N. Y. 403, 414 ; *Barry* v. *Lambert*, 98 N. Y. 300, 305 ; *Williams* v. *Fitch*, 18 N. Y. 546 ; *Brown* v. *Lynch*, 1 Paige, 147 ; *Ryan* v. *Dox*, 34 N. Y. 307 ; *Marie* v. *Garrison*, 13 Abb. N. C. 214, 282, 287 ; *Genet* v. *Davenport*, 56 N. Y. 676.)

*Robert G. Ingersoll* for respondents. The appellants are estopped by *laches* and positive acquiescence. (*F. L. & T. Co.* v. *B. & M. T. Co.*, 119 N. Y. 15, 23 ; 6 N. Y. Supp. 643 ; *Credit Co. of London* v. *Arkansas Cent. R. R. Co.*, 15 Fed. Rep. 47 ; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587 ; 2 Herman on Estoppel [Ed. 1886], 1195 ; *Norway* v. *Rowe*, 19 Ves. 144 ; *Clegg* v. *Edmondson*, 8 De G., M. & G. 787 ; *Burnett* v. *Brown*, 105 Mass. 551 ; *McMahon* v. *N. Y. & L. B. R. R. Co.*, 24 N. J. Eq. 56 ; *Matter of Flushing Ave.*, 101 N. Y. 678 ; *Depew* v. *Dewey*, 46 How. Pr. 441, 447, 448 ; *Sheldon H. B. Co.* v. *Eickemeyer H. B. Co.*, 56 How. Pr. 70 ; *Lockwood* v. *McGuire*, 57 How. Pr. 266 ; *Haines* v. *Taylor*, 3 How. Pr. 206.) Neither the reorganization committee, the purchaser nor the assignee of his bid, was guilty of any fraud. (*Matthews* v. *Murchison*, 15 Fed. Rep. 691, 694 ; *Nashville, C. & St. L. R. Co.* v. *U. S.*, 113 U. S. 261 ; *Vilas* v. *Page*, 106 N. Y. 439, 452 ; *Central T. Co.* v. *Seasongood*, 130 U. S. 482 ; *F. L. & T. Co.* v. *B. & M. T. Co.*, 119 N. Y. 15 ; *Fuller* v. *Van Geesen*, 4 Hill, 171 ; affd., How. App. Cas. 240 ; *Fort* v. *Burch*, 6 Barb. 75 ; *McLaren* v. *Hartford F. Ins. Co.*, 5 N. Y. 151 ; *Mitchell* v. *Bartlett*, 51 N. Y. 447 ; *Cheney* v. *Woodruff*, 45 N. Y. 98 ; *Whalin* v. *White*, 25 N. Y. 462 ; *Stimson* v. *Arnold*, 5 Abb. N. C. 377.) There was no irregularity in the judgment of foreclosure and sale, or in the proceedings had thereunder, and, even if held to be irregular, such irregularities have been

waived and do not go to the merits. (*Woodhull* v. *Little*, 102 N. Y. 165; *Abbott* v. *Curran*, 98 N. Y. 665; *Blakeley* v. *Calder*, 15 N. Y. 617; *F. L. & T. Co.* v. *B. & M. T. Co.*, 119 N. Y. 15.)

*William W. Cook* for The United Lines Telegraph Company .et al., respondents. The complaint and the proofs do not show that it will be any advantage to the plaintiffs even if they get all they claim in the complaint. (*Foster* v. *Mansfield, etc., R. R.*, 146 U. S. 88; *Carey* v. *Houston & T. C. Ry. Co.*, 52 Fed. Rep. 671; *Aron* v. *DeCastro*, 13 N. Y. Supp. 372; *F. L. & T. Co.* v. *B. & M. T. Co.*, 148 N. Y. 315.) The decision of this court in *Farmers' Loan & Trust Co.* v. *Bankers & Merchants' Telegraph Co.* (119 N. Y. 15) is a bar to this case. (*Brinckerhoff* v. *Bostwick*, 99 N. Y. 185; *Innes* v. *Lansing*, 7 Paige, 583; Story's Eq. Pl. § 120; Black on Judgments, § 537; *Willoughby* v. *Chicago, etc., Co.*, 50 N. J. Eq. 656.) The *laches* of the plaintiffs is a bar to this suit. (*Sheldon H. B. Co.* v. *Eickemeyer H. B. M. Co.*, 90 N. Y. 607; *Hoyt* v. *Latham*, 143 U. S. 553; *Ashley's Case*, L. R. [9 Eq.] 263.) The general powers given by the reorganization agreement of May, 1885, to the committee were sufficient to sustain the modification of the agreement made by the committee August 7, 1885. (*White* v. *Wood*, 129 N. Y. 527.) The proofs show that there was no fraud in the modified agreement of August 7, 1885. (*Brooks* v. *Dick*, 135 N. Y. 652.)

VANN, J. As the respondents do not appeal, they are bound by the findings of fact made by the trial court; while the appellants are bound by all to which they did not except, and since the affirmance by the General Term, by all even of those excepted to that find any reasonable support in the evidence. (*White* v. *Benjamin*, 150 N. Y. 258.) Hence, in reviewing this case, we must start with the assumption that Mr. Stokes promised to perform the reorganization agreement, and was bound thereby, for the evidence is ample to sustain

the finding to that effect, and the respondents do not question it by appealing. That promise was founded on the consideration that the receivers' certificates held by him, as to which serious questions existed that were pending in the courts, should be expressly rendered valid by an amendment of the decree in foreclosure. That amendment was promptly made by the consent of the plaintiffs and other bondholders through the reorganization committee, and through the same agency the litigation pending at the time to test the validity of the certificates was discontinued and ended. " When a defendant has actually received the consideration of an agreement by a voluntary performance of an act by the other party, upon his proposition or suggestion, such performance constitutes a consideration which will uphold the defendant's promise." (*Marie* v. *Garrison*, 83 N. Y. 14, 26.) Moreover, the settlement of a doubtful or disputed claim is a good consideration. ( *White* v. *Hoyt*, 73 N. Y. 505.)

At this point of time, therefore, we have a binding contract, executory on the part of Mr. Stokes and executed on the part of the committee. It was found and is conceded that he has not performed that contract, and the only question presented, aside from that relating to the form or extent of the relief, is whether he has in any way been lawfully relieved of his obligation to perform, or from the consequences which would ordinarily follow from his breach of the contract. He agreed to receive in round numbers $700,000 in the first mortgage bonds of the new company, whereas he actually received $900,000 ; and he agreed that the second mortgage bonds of the new company should cover all the property on which the mortgage foreclosed was a lien, when in fact the stocks and securities, through which the Bankers & Merchants' Telegraph Company controlled the connecting links in their system, were omitted from that mortgage, and those stocks and securities were delivered to him as collateral to certain loans and advances that he made. He also agreed to buy in the property at the foreclosure sale for the benefit of the reorganization committee, and in accordance with the

64

plan agreed upon, and for this reason there was no competition in bidding ; but when the auctioneer struck the property off to him one of the attorneys for the plaintiff in the foreclosure suit said, "For the reorganization committee ?" and Mr. Stokes replied, "No, for myself."

Several theories are relied upon to justify the action and non-action of Mr. Stokes, upon none of which, however, did the courts below unite in pronouncing judgment. Those theories are (1) that there was a rescission of the reorganization agreement; (2) that there was a lawful modification of that agreement ; (3) that there was a ratification by the plaintiffs, and (4) that there was such *laches* on their part as to defeat their cause of action. We will now consider these theories of defense in the order named.

1. Rescission. It is not claimed that Mr. Stokes could rescind his contract upon any ground that existed when it was made, such as fraud, inadequacy of consideration, mistake or illegality. Nor could he rescind for non-performance by the reorganization committee representing the bondholders, for the contract was at once performed by them, so far as it related to him personally, by the amendment of the decree so as to declare his certificates valid, and the withdrawal of the appeal brought to test their validity. There was no failure of consideration and no reservation of the right to rescind. The ground upon which it is now claimed that a rescission could have been made is that through the wrongful act of a third party the property had become of less value than it was when the contract was entered into. There was, however, no rescission upon this ground or upon any other. The only evidence of any attempt to rescind is that Mr. Stokes, on the day after the wires were cut, stated to his own attorney, Mr. Lauterbach, in the presence of Mr. Townsend, the chairman of the reorganization committee, that he could not carry out the agreement.

Effective rescission requires a lawful right to rescind, due notice of an intention to rescind and the restoration of benefits received by the party attempting to rescind, so that the other

party may be placed in *statu quo.* Even if the most complete right of rescission exists it cannot be exercised without a return or an offer to return such benefits. The only exception emphasizes the rule. (*Kley* v. *Healy,* 127 N. Y. 555, 561.) Mr. Stokes made no attempt or offer to return the substantial benefits that he had received. He did not procure or offer to procure a reamendment of the decree by striking out the clause recognizing the validity of his certificates, or to revive the appeal. Retaining all that he had received, he simply said that he could not perform.

A contract cannot be thus put aside, for one party cannot speak for both, or bind and loose both at his discretion. Even upon the assumption that Mr. Stokes had the right to rescind, and that his notice of intention was sufficient, there was no valid rescission on account of his failure to restore the benefits and to place the other parties in the same condition that they were when the contract was made. It is, however, very doubtful whether Mr. Stokes intended his declaration to his own counsel, in the presence of a member of the reorganization committee, to be a notice of intent to rescind, for two months after the alleged rescission and six weeks after the sale in foreclosure, he made an affidavit in a proceeding commenced by one Bill to have the foreclosure decree amended so as to provide that the receivers' certificates should share in the proceeds of the sale in the order of the equities of the claims underlying them, in which he recognized the reorganization agreement as in existence, made no claim that it had been rescinded, and admitted that he was to buy the property for the committee and turn the same over to them, or to any corporation to be designated by them. A similar affidavit was made by Mr. Townsend in another legal proceeding, and used in court with the knowledge and consent of the counsel for Mr. Stokes. We think that the oral agreement of Mr. Stokes with the committee was never rescinded or abandoned.

2. Modification. The reorganization committee were, in a broad sense, trustees for the benefit of the bondholders and were bound to protect their interests in every reasonable way.

Their powers were defined and limited by the reorganization agreement. While they had a wide discretion as to all matters not specifically provided for, as to those matters they were bound to compliance with the stipulations of the agreement, which they could neither set aside nor disregard. They had no power to change that agreement without the consent of the bondholders, whose representatives they were. They could not recast it nor surrender rights which it expressly secured to the bondholders. In violation of their duty they entered into a modification of the reorganization agreement and thereby materially increased the amount of first mortgage bonds going to Mr. Stokes and provided that the stocks and securities of the subsidiary companies should be left out of the new mortgages and that the new corporation should be authorized to " dispose of them upon such terms as it may deem proper, using the proceeds thereof for the benefit of itself." This subjected these securities to the will of Mr. Stokes, who was to be the owner of $2,250,000 out of the $3,000,000 of stock of the successor company. When this property of the bondholders was subsequently used to secure money lent by Stokes to the new company, it virtually went to secure him individually for loans made to himself in a corporate capacity. The reorganization agreement was specific in providing that the new mortgages should cover all the property, including the stocks and securities by which the subsidiary lines were controlled. If they had power to modify or dispense with this stipulation, they had power to disregard the agreement in every particular and to enter into a new and wholly inconsistent contract without the consent of the bondholders for whom they were acting. They could thus set aside and subvert the very instrument which was the source of all their power. It is idle to claim that they could change or dispense with an express stipulation of the agreement, or that in doing so they acted in good faith. Even if they acted in good faith as matter of fact, they are presumed to have acted in bad faith as matter of law. They, in effect, gave away property which belonged to the bondholders and

which was essential to the control of the auxiliary lines, and without which the new company, whose corporate name expressed the idea of uniting all the lines, would become substantially helpless because its system would be destroyed. Both of the courts below united in holding that the reorganization committee had no power to thus alter the terms of the reorganization agreement, except by the consent of all the bondholders who had become parties thereto, although the Special Term held that the increase in the amount of first mortgage bonds of the new company which Mr. Stokes was to receive was within the power conferred by the original agreement. This was put upon the ground that they could use first mortgage bonds to raise money in order to carry out the plan, overlooking the fact that Mr. Stokes had already agreed to provide such money as should be needed for that purpose. Of course, if Stokes' advances, together with his receivers' certificates, should amount to $900,000, he would be entitled to that sum in the first mortgage bonds of the new company, but the committee modified the agreement so as to give him $900,000 in such bonds, whether his advances and receivers' certificates amounted to that sum or not. This modification, in view of subsequent events, may not be important, but the attempt to give Mr. Stokes the stocks and securities in question for any purpose whatever was beyond the power of the committee, and a violation of the trust confided to them. If they had power to give him the auxiliary lines, they could have given him the main line. If, by their own action, they could enlarge their powers in one respect, they could do so in all respects. Their action was beyond their authority and void. They could not add to their authority by changing the agreement, which was the source and limit of their power, any more than one can add to his stature by taking thought.

3. Ratification. The trial court found that on August 10th, 1885, one of the plaintiffs ratified the modification agreement, made three days before, by requesting Mr. Stokes "to get back" from the receiver the sum of $2,000 that he had

advanced to meet his expenses, and accepting repayment accordingly. These expenses, according to the decree in foreclosure, were the first lien on the proceeds of the sale, and the amount paid down in cash to the referee on July 31st, the day of sale, was much more than was necessary to cover them. Moreover, Mr. Stokes had agreed to furnish the receiver with all funds necessary to carry out the plan of reorganization, which included the receiver's expenses. There was no express agreement to ratify, for nothing was said upon the subject. There was no consideration for any implied agreement, for Mr. Cox received nothing but what was due him in any event, and the money for the purpose was at the time, or should have been, in the receiver's hands. No one was misled by the transaction, nor was any action based thereon by any one to his prejudice. Mr. Cox did not agree to do anything if the repayment was made.

The facts, however, according to the undisputed evidence, were not precisely as found by the court. The sum of $2,000 was not advanced by either of the plaintiffs, but by Farley Cox, a brother of Townsend Cox, who asked Mr. Stokes to get the receiver to pay back the money to the one who had lent it to him. Mr. Guthrie, the counsel for the reorganization committee, and Mr. Townsend, its chairman, made the same request. The plaintiffs' firm, which had been dissolved at the time, had nothing to do with the loan or the repayment thereof. Neither of the plaintiffs was shown to be directly or indirectly liable for the loan. While Stokes, in fact, furnished the money with which the receiver repaid Mr. Farley Cox, the receiver was lawfully bound to pay the loan from money that he had received for that purpose. If he had used the money for another purpose he was not discharged from the obligation of payment on that account. Mr. Stokes was not requested by either plaintiff to furnish the money, and it does not appear that he advanced anything which, under the reorganization agreement, he was not obliged to pay. Neither his position nor that of the receiver was in any way altered by anything said or done by Mr. Cox. No defense

founded on waiver or estoppel was pleaded, and, as we think,
none was established, for scarcely one of the essential elements
was proved. There was no evidence that the plaintiffs
intended to forego any advantage or to surrender any right.
Nothing was done by them inconsistent with the existence of
the rights now sought to be enforced or with their intention
to rely upon those rights. There was no consideration,
intent, misleading conduct, change of position or mutual
understanding from which a waiver or estoppel could properly
be inferred.

4. *Laches.* Neither of the opinions written in the courts
below gave this point any notice. Whether the equitable
doctrine of *laches*, as distinguished from the Statute of Limita-
tions, now exists in this state, is open to serious doubt. (*Gal-
way* v. *Metropolitan Elevated Ry. Co.*, 128 N. Y. 132, 143;
*Derby* v. *Yale*, 13 Hun, 273; Throop's note to section 414,
Code Civ. Pro.; Wood on Limitations, 62; 2 Perry on Trusts,
§ 896.). But, whatever the law upon the subject may be,
there is no reasonable foundation for the claim that the plain-
tiffs by their *laches* have forfeited their rights under the
reorganization agreement and the violation thereof by cer-
tain of the defendants. This action was commenced within
two weeks after the referee's report of the sale in fore-
closure was filed, and within thirty days after the sale the
Roebling action, which is still undetermined, was brought
against these same defendants attacking the modified agree-
ment, asking that the reorganization agreement should be per-
formed and that the United Lines Telegraph Company should
be directed to execute the first and second mortgage bonds
covering all the property sold and purchased at the sale.
Several motions to set aside the sale had also been made, and
one of them at least was pending for a long time. Knowing
that their proceedings were thus attacked, Stokes, the commit-
tee and the United Lines Telegraph Company continued, in
defiance of the reorganization agreement, to carry on their
scheme, as embodied in the modified agreement. Under these
circumstances no one could have been misled, simply because

the plaintiffs waited to see whether relief would come through the pending litigation, or whether the sale would be confirmed, before commencing their action.    The defendants proceeded at their peril, because they had full notice that some of the bondholders at least had not acquiesced in their unlawful acts, but were active in the assertion of their rights.   We repeat, as applicable to this case, so far as the question of *laches* is concerned, the language of the court in *Boardman* v. *Lake Shore & Michigan Southern Ry. Co.* (84 N. Y. 157, 183): "It appears that there has been, ever since the expiration of the time when the dividends were due, an active and continuous litigation, and a sharp controversy in the courts with other parties against the old corporation and the defendant, by stockholders who are similarly situated with the plaintiffs, to recover dividends upon the preferred stock.   *   *   *   The defendant necessarily was acquainted with the character of the litigation, with the questions involved and the claim of the preferred stockholders to the dividends ; and in the face of these facts, with full notice of the nature of the claim, has no ground for insisting that it would have acted otherwise if the plaintiffs had sued at an early day.   It was not required that each particular stockholder should sue for his share of the dividends to preclude the defendant from claiming an acquiescence and estoppel ; and it is quite sufficient that it was advised of the character of the claim of the respective stockholders.   The plaintiffs and other stockholders were entirely justified in awaiting the result of suits pending without incurring the hazard of losing their rights on account of the lateness of their demand."   So the plaintiffs in this action, under all the circumstances, were not obliged to sue more promptly in order to save their rights.   They had a cause of action and did not lose it by their silence, even if they knew that Mr. Stokes was advancing money on the strength of the modified agreement, because he is presumed to have known that that agreement was made without authority, and he had notice from various legal proceedings against himself and others that the bondholders were attacking it on that ground.

There was no estoppel, because he had no right to act in reliance upon the silence of some bondholders, when others were acting in behalf of all. The summons and complaint in the Roebling suit were served on him individually and as president of the United Lines Telegraph Company in August, 1885. The object of that action was to restrain the execution of the modified agreement and to compel performance of the reorganization agreement. The pendency of this representative action was sufficient notice to Mr. Stokes and the other defendants therein that the bondholders were actively resisting the new scheme and were insisting that he should perform his contract, and neither he nor his company can now claim that their subsequent action was taken in reliance upon the acquiesence of the bondholders. The reorganization agreement was signed by more than one hundred different parties, and it was not necessary that each should sue in order to preserve his rights. Suit by one of a class, in behalf of all, relieves all from the imputation of *laches.*

Without expressing any consideration of incidental points urged by the learned counsel for the respondents, we have reached the conclusion that no absolute defense was established and that the plaintiffs are entitled to some relief, the extent of which must depend upon the facts found on the new trial, which it is our duty to award. In view of the large advances made by Mr. Stokes, and the doubtful success of the enterprise in any event, it may be that the relief will prove of slight value to the plaintiffs, but we cannot withhold justice from them because their rights are small. Doubtless specific performance of the rights of the bondholders cannot now be had in justice to third parties. (*Farmers' L. & T. Co.* v. *B. & M. Tel. Co.*, 119 N. Y. 15, 23.) We think, however, that upon the facts as they now appear the plaintiffs are entitled to an accounting upon an equitable basis, such as the probable value of the new second mortgage bonds if the reorganization agreement had been performed, crediting Mr. Stokes with all moneys properly advanced or expended by him, or to such damages as they can establish for the breach of the agreement.

65

At present they have nothing for their bonds deposited with the committee of the par value of $731,000, the actual value of which, though much less, was something. They have never received even the second mortgage bonds, and the absolute dismissal of their complaint upon the merits left them helpless.

The judgment should be reversed and a new trial granted, with costs to abide the event.

All concur, except PARKER, Ch. J., not sitting, and GRAY and O'BRIEN, JJ., not voting.

Judgment reversed, etc.