(40 Misc. Rep. 601.)

### SLAYBACK v. RAYMOND et al.

(Supreme Court, Special Term, New York County. May, 1903.)

1. FRAUD—ACCOUNTING—EVIDENCE.

Plaintiff, interested in a corporation as a bondholder and stockholder, became involved, and requested the president of the corporation to procure in the future the financial aid which he had previously rendered from a capitalist. The defendant thereafter induced plaintiff to transfer his stock to him, fraudulently alleging that the capitalist required it as a condition to rendering such aid. *Held*, that the defendant would be compelled, in equity, to return such of said stock as stood in the books in his name or in the name of his nominal transferees, and account for such as could not be returned and for dividends earned.

2. SAME—LACHES.

In an action for fraud, under Code Civ. Proc. § 382, subd. 5, no question of laches, in the strict sense of that term, is involved.

Action by John D. Slayback against Charles M. Raymond and others to recover, on the ground of fraud, a judgment for the return by the defendants of certain shares of stock, and for an accounting. Judgment against defendant Raymond.

Bacon & Merritt (McCurdy & Yard, of counsel), for plaintiff.
Charles A. Hess (Louis Marshall, Charles A. Hess, and Jacob Halstead, of counsel), for defendants.

LEVENTRITT, J. Under the authority of Marvin v. Brooks, 94 N. Y. 71, and allied cases, this suit is well brought in equity.

On the merits, I find the plaintiff's story reasonable and worthy of credence, while I have not been impressed with the likelihood of the defendants' version. I have reviewed the testimony with great care,

¶ 2. See Equity, vol. 19, Cent. Dig. § 195.

with the result that the view I took of the facts on the trial, when I saw and heard the witnesses before me, finds corroboration in many details.

The plaintiff was the financial backer of the Carbon Steel Company of New Jersey and this fact was generally known. The defendant was its executive head, but, so far from being possessed, or known to be possessed, of large means, there are various items of evidence to the contrary. The plaintiff's private firm, being threatened with financial embarrassment in the generally depressed and tightened conditions of 1893, requested the defendant to seek the intervention of a capitalist at Pittsburg (one James Hemphill), who was interested in several concerns supplying the Carbon Steel Company with material, and whose business ability and financial strength had arrested the decline of another company, to the end that the impending insolvency of the plaintiff's firm should not affect sympathetically the standing of the Carbon Steel Company when its recognized financial support should have become impotent. The plaintiff offered to give up one-half his stock holdings in the event that Hemphill could be induced to take hold and succeed in having credit extended to the Carbon Steel Company. The defendant went to Pittsburg, returned, and, according to the plaintiff, reported that Hemphill would accept only on condition that plaintiff should yield his entire stock holdings, and that his wife should turn over one-half of her first preferred stock; that one Robinson, who was vice president of the company, had to give up all his stock; and that the defendant "had to do the same." The plaintiff, for himself and his wife, both being creditors of the company to a large amount on notes, as well as holders of a substantial block of bonds, agreed to the proposition, and delivered the stock to the defendant for transfer to Hemphill. It is undisputed that not a share of stock was ever delivered to Hemphill. The defendant claims that it was given to him individually to enable him to control the company on his agreement personally to guide it over the shoals into safety. His version is that the plaintiff requested him to induce Hemphill to accept a receivership of the company; that he went to Pittsburg on this mission; that Hemphill refused; that he carried this refusal to the plaintiff, and then made an alternative proposition to the effect that if the plaintiff would give up all his stock, and his wife half of hers, he "would find a party or parties to loan us [the Carbon Steel Company] the money and give us the credit, and carry on the company; that I would guaranty his note for himself and his wife, and would guaranty the company and make the bonds good." As to the Robinson stock, the defendant testified:

"I said Mr. Robinson would have to give his stock if I needed it. It was necessary for me to have control of the company, in order to warrant my attempting or doing—taking the risk that I was going to take to carry this out as a personal obligation."

I find myself unable to accept this story of the defendant. I deem it necessary to refer merely to some of the many facts which show its improbability. The relations between the plaintiff and the defendant were such that the plaintiff was necessarily fully advised of the defendant's financial standing. It seems most unlikely that where, of the

two, the plaintiff had always been called upon to supply the financial support of the company, he should promptly, on the defendant's naked oral promise to see the company through, and secure the necessary party or parties to loan money and give credit, turn over his all,—especially where, according to the defendant's version, a simple question of control was involved. If control of the stock was all that was required, it would seem that the plaintiff, having far more at stake than the defendant, and being admittedly on most friendly terms with him, would readily have acquiesced and voted his stock as the defendant required it; or if, as the defendant claims, he needed stock to give to "other people," which seems to be his main contention, that the plaintiff would willingly have consented, from time to time, to contribute his proportionate share, rather than divest himself of his entire holdings at once, when the "other people" were not yet determined. Further than this, the defendant testified that his wife gave up all her stock, but that he never called upon Robinson to give up his. The reason assigned for not requiring the latter to do so is entirely unsatisfactory. "Because he would always vote any way I voted," is the defendant's reason. But if control was all that was sought, it is quite evident that the plaintiff would have voted similarly; and the defendant concedes that though Mrs. Raymond, his wife, would likewise have voted the way he told her to, yet he took her stock. Further, if Robinson had been called upon to yield his stock, it is manifest that just by that amount the plaintiff and his wife would have been relieved from yielding theirs. Finally, the use made of the stock discredits the version of the defendant. It went in part to employés; a small portion to Newton Hemphill, the son of James Hemphill; but the bulk of it to nephews and nieces of the defendant, who could render no conceivable service to the corporation. It also appears quite satisfactorily. that these transfers to relatives were merely nominal, for the defendant testified that from the beginning of his holding of this portion of the transferred stock to the present day the dividends thereon have been paid to him personally.

Again, it does not appear that, after the transfer by the plaintiff to the defendant, the latter ever did get a single party or parties to advance money, or that a single new avenue of credit was opened. All that hapepned was that the creditors of the company extended the time of payment. The defendant, driven to cover, rests the entire consideration for the transaction between him and the plaintiff on the latter's desire to save the money loaned to the corporation, and to see the bonds made good. But it is a tax on credulity to be asked to believe that, after the plaintiff had sought the aid of a large capitalist, he would, on the first suggestion, without bargain or parley, accept the proposition of one who, on behalf of the company, had theretofore called on the plaintiff to come to its financial assistance, whose own financial standing, as known to the plaintiff, did not warrant the assumption of any such personal liability; who offered, in place of the named capitalist, unnamed parties, to be secured in the future; and who, above all, offered an unenforceable oral personal guaranty in consideration of the plaintiff's turning over every dollar of stock he had in the company, and that at a time when, under the defendant's own ver-

sion, the necessity therefor had not arisen.    I accept the story of the plaintiff.

There remains to be considered the question whether the plaintiff's remedy is barred by the statute of limitations.    The plaintiff sues to recover a judgment on the ground of fraud—to procure the return of certain shares of stock, their transfer on the books of the company, and an account for dividends and for such of the stock as cannot be returned.    The fraud was committed in the month of July, 1893.    The action was begun on January 5, 1900.    The plaintiff claims that he did not actually discover the fraud until the spring of 1898, when Robinson, who had been told by Raymond, informed him of it.    The plaintiff is entitled to credence.    But the question, under the authorities, is not so much one of actual discovery, as it is whether any facts came to plaintiff's knowledge which fairly put him on inquiry as to the commission of the fraud, which should have awakened suspicion, and which made it his duty further to investigate.    Higgins v. Crouse, 147 N. Y. 411, 417, 42 N. E. 6.    Knowledge is imputed to a party, which he ought to have had, and would have had if he had done his duty, and we are required to say, "for the purpose of the statute of limitations, that there was, in law, a discovery of the facts which constitute the fraud."    Id.    Was there, in law, such a discovery?    This case falls under subdivision 5 of section 382 of the Code, barring in six years "an action to procure a judgment, other than for a sum of money, on the ground of fraud," etc.    Bosley v. National Machine Company, 123 N. Y. 550, 25 N. E. 990.

The fraud having been perpetrated in July, 1893, the six-year period began to run from the date that the plaintiff discovered or should have discovered the fraud.    As the action was begun on January 5, 1900, we are concerned here only with the question whether the plaintiff was put on his inquiry between July, 1893, and January 5, 1894; the beginning of the six-year period terminating on January 5, 1900, the date of the service of the summons.    The defendant claims that the plaintiff should have had knowledge, and was put on his inquiry, and therefore had actual knowledge in law, by the following facts:    At the time of the fraudulent representations the plaintiff was treasurer of the corporation, having access to its books; that he continued treasurer for a period of three or four years, and a director until just prior to the commencement of the actions; that he was acquainted with Mr. James Hemphill and his son; that the latter frequently came to New York, and that the plaintiff could thus have learned from Newton Hemphill whether or not James Hemphill had received the surrendered stock; that the plaintiff was present at the various annual meetings of the Carbon Steel Company of West Virginia, organized in 1894, the successor corporation of the Carbon Steel Company of New Jersey; that he was frequently in the chair; that the list of stockholders was read; and that the plaintiff must have or should have known that the name of James Hemphill was not on the list.    The defendant also claims that the plaintiff, as treasurer, signed the stock certificates of the West Virginia corporation which were substituted for those of the New Jersey corporation.    This, however, the plaintiff denies, and, as the means of proof were available to the defendant, I reject this

item of evidence. It is necessary, then, to consider how far the items stated, or any of them, should have awakened suspicion on the part of the plaintiff, and put upon him the duty of inquiry. I may say here, as bearing on the merits of the case, as well as the particular phase now under discussion, that the defendant had much corroborative evidence available to him in the books and records of the corporation, which he omitted to produce.

The fact that the plaintiff was an officer of the several corporations, and had access to the books, advised him of nothing. He had surrendered his stock under the belief, as he testified on cross-examination, that it was gone forever. Until 1898 he had no suspicion that he had been defrauded. There was thus no occasion to go to the books to look for something he did not suspect. This assumes, of course, that the plaintiff should have known James Hemphill to be a stockholder of record—an assumption that may be unwarranted, in view of the testimony of the defendant's witness Brinner that thousands of shares stood nominally in his name, of which other persons were the owners. The plaintiff's acquaintance with the Hemphills, and the presence of the son in New York on divers occasions, cast no duty of inquiry on the plaintiff to ask of the son whether the father had received what the plaintiff had no reason to assume he had not. The question of facts known to the plaintiff, from which the inference of fraud followed as a matter of law, reduces itself to such facts as the plaintiff must have learned at the annual meetings, or rather at the single annual meeting, if any, preceding the year 1894, for any facts learned in that year or thereafter can have no bearing on the presumption of knowledge we are considering, as the action was begun within six years of January 5, 1894. Although the record contains no specific item of testimony when the annual meetings were held, there are in evidence a series of statements of the financial condition of the corporation, all dated October, which indicate that the annual meetings were held in or after that month. In other words, I shall assume that one annual meeting was held between July, 1893, and January, 1894. No importance is to be attached to the fact that the elder Hemphill—a man well on in years, a resident of Pittsburg, and who, as disclosed by the record, was an infrequent visitor at New York—was not present. Conceding that the stockholders' list was read at the annual meeting of 1893, although the only evidence is that it was "usually read off," and that the name of James Hemphill did not appear therein, two considerations suggest themselves:

First. There is no positive proof in the record that the list was read, or that the plaintiff heard it read, at the annual meeting of 1893. Inquiry on the trial was merely directed to the meetings of 1894 and subsequent years. The evidence in the record on this point is as follows:

"Q. And you also attended the various annual meetings, didn't you? A. I did. Q. And at those annual meetings you were generally in the chair? A. Frequently. Q. And you conducted the business that was transacted at those meetings? A. I presided. Q. At those different meetings you knew who voted there, either in person or by proxy, did you not? A. The list was usually read off. Q. You did not understand, from any list which was read off at any of those meetings which were held in 1894, 1895, 1896, 1897, and

1898, that Mr. James Hemphill held any stock in the Carbon Steel Company? A. I have no recollection of ever having heard his name. Q. And you attended at all those meetings that I have mentioned? A. I think so. Q. And you were actually in the chair at all those meetings? A. Most of them. Q. You were either in the chair, or actively participating in what was being done? A. Yes. Q. And heard the list read off? A. Yes."

There is thus neither here nor elsewhere in the record any positive proof that the list, which was "usually read off," was in fact read at the meeting in 1893. Inasmuch as the statute of limitations is an affirmative defense, the burden was on the defendant to show that the list was read off in 1893, that the plaintiff heard it, and that, having heard it, the omission of the name of James Hemphill, to whom he thought his stock had been transferred, should have been to him so striking as forthwith to arouse his suspicion and put him on his inquiry.

Secondly. The name of Hemphill was read off at this meeting— not the name of James Hemphill, but that of the son, Newton Hemphill. The latter was both a stockholder and director. And it certainly is not unreasonable to assume, in view of the fact that the plaintiff had no further interest in this stock, and believing that it was gone forever, and in view of the fact that the argument as to what the plaintiff must or should have known reduces itself solely to the inference to be drawn from the failure to hear the name of James Hemphill read off, that his hearing the name of a Hemphill was quite sufficient to let unborn suspicion remain unborn. I am therefore of the opinion that no facts came to the plaintiff's knowledge which fairly put him on his inquiry prior to January 5, 1894.

I have treated the question of the statute of limitations regardless of any question of laches, for I am of the opinion that this being an action for fraud, under section 382, subd. 5, no question of laches, in the strict sense of that term, is involved. See Throop's Code, note to section 414. The Court of Appeals has said, "Whether the equitable doctrine of laches, as distinguished from the statute of limitations, now exists in this state, is open to serious doubt." Cox v. Stokes, 156 N. Y. 491, 511, 51 N. E. 316; Derby v. Yale, 13 Hun, 273, held that it did not. See, also, Kenyon v. National Life Association, 39 App. Div. 276, 294, 57 N. Y. Supp. 60; Wood, Lim. § 62. The case relied on by the defendant (Calhoun v. Millard, 121 N. Y. 69, 24 N. E. 27, 8 L. R. A. 248) is not to be taken as an authority in point. It seems to be in conflict with the later dictum in Cox v. Stokes, supra, and, in any event, arose under a different and very general section, and did not involve the question of fraud. In this case we have the specific statutory provision that the plaintiff shall have six years after the discovery of the fraud within which to bring his action, and I see no room for the application of an equitable doctrine in an equity suit, where the statute has defined within what time suit may be brought. Further, even laches are ordinarily not invoked unless the parties have changed their positions. In this case, so far as the bulk of the stock is concerned, the defendant is to be regarded the owner to-day, for his gift to his nephews and nieces, retaining unto himself the dividends, shows, at most, a nominal transfer. The court will not invoke the doctrine of laches to offend its own conscience.

I am of the opinion that the plaintiff is entitled to judgment against the defendant Raymond.   No case has been made out against the defendant's wife, and as to her the complaint should be dismissed, without costs.

Judgment accordingly.