The Rector, Wardens and Vestrymen of the Church of Saint Matthew and Saint Timothy in the City of New York, Appellant, *v.* Title Guarantee and Trust Company, Respondent.

First Department, February 7, 1936.

*Frederick J. Moses*, for the appellant.

*Richard S. Holmes* of counsel [*Flynn L. Andrew* with him on the brief; *Milbank, Tweed, Hope & Webb,* attorneys], for the respondent.

TOWNLEY, J.   The amended complaint seeks a judgment rescinding the purchase and sale of a mortgage by the defendant to the plaintiff in the amount of $14,000.   The mortgage was assigned to the plaintiff by the Bond and Mortgage Guarantee Company on September 9, 1932.   The sale, however, was consummated by, and the plaintiff dealt exclusively with, the defendant.

Plaintiff is a religious corporation.   The chairman of its finance committee, Mr. Shaw, on or about September 7, 1932, telephoned the title company that he had $20,000 to invest and would like to have offerings submitted to him.   The defendant's salesman Potter either sent or took several mortgages to Shaw, including the mortgage in question.   The offering slip is headed " Title Guarantee and Trust Company, Capital and Surplus $34,000,000," and stated:

" The first mortgage described below is offered for sale subject to previous acceptance with the payment of principal and interest guaranteed by

Bond and Mortgage Guarantee Company      55
Capital and Surplus $21,000,000
Draw check (New York funds) to order of Title
Guarantee and Trust Company "

After consultation with his associates on the finance committee, Shaw purchased the mortgage on behalf of the plaintiff on September 9, 1932.   The mortgage was then in default and had been for about nine months.   The taxes for the last half of 1931 and the first half of 1932 had not been paid and were a prior lien.

Shaw testified that, when he read the offer to sell this mortgage, he believed it was a first lien on the property.   He made no examination of the title because he was purchasing from the Title Guarantee and Trust Company.   He relied on their representation that this was a first mortgage and believed it was.   He had no knowledge that there were any unpaid taxes upon the property.   If he had known it, he would not have purchased it.   Shaw's associates on the committee testified to the same effect.   The trial court found that defendant's written offer which declared that the mortgage was a first mortgage was made with the intention and expectation that it would be relied on by the plaintiff.

The men representing the plaintiff were men of affairs: One was president of a manufacturing company; another was assistant

comptroller of a railroad; and a third was a vice-president of a New York trust company. They all relied upon the reputation of the defendant and believed that the statement that this was a first mortgage carried with it an implication that there were no prior liens upon the property.

On September 5, 1933, plaintiff elected to rescind the purchase because of the suppression of the fact that taxes were in arrears and that the defendant had known of that fact. Defendant had documentary knowledge in two title searches revealing the arrears and had made no disclosure. The defendant denied under oath in its pleadings that it knew the taxes were in arrears.

On these facts the court refused to finds as follows:

" 12. At the time of the offering and sale of that mortgage to the plaintiff the fact that those taxes were unpaid and in arrears and that they were a lien superior to the lien of the mortgage was known to the defendant. * * *

" 14. The fact that those taxes were unpaid and in arrears and were a lien upon the mortgaged premises superior to the lien of the mortgage was a material fact upon the sale of that mortgage. * * *

" 17. The plaintiff purchased that mortgage believing that it was the first lien upon the mortgaged premises.

" 18. The plaintiff relied upon the declaration of the defendant with reference to the mortgage.

" 19. The plaintiff would not have purchased that mortgage had it been informed of the fact that those taxes were unpaid.

" 20. That the suppression by the defendant of the fact that those taxes were unpaid, when offering that mortgage for sale to the plaintiff was a fraud upon the plaintiff.

" 20a. That the defendant's declaration that that mortgage was a first mortgage without disclosing the fact that those taxes were in arrears and unpaid was a misrepresentation of fact."

We think that in refusing so to find the learned trial court was in error. It is true that implied warranties in the Sales Act do not apply to sales of mortgages (Pers. Prop. Law, § 155), but the common law applies. As the Court of Appeals said in *Brennan* v. *Nat. Equitable Investment Co.* (247 N. Y. 486, 490): "A duty to speak is imperative as matter of law where conduct, accompanied by silence, would be deceptive and beguiling."

The question is what is meant by the description of a mortgage as a " first mortgage." No cases exactly in point have been drawn to our attention arising in this State. It was, however, long ago held in *Green's Appeal* (97 Penn. St. 342) that the words " first mortgage " have a fixed definite meaning and imply that the lien

of the mortgage is prior to that of any other claim. Writing in 1881, the court said (p. 347): " In the business of half a century, a first mortgage has come to be very well understood to be one prior to all other liens. That is the kind of mortgage which was guaranteed, and the bonds thereby secured Noble received on his contract. The learned judge of the Common Pleas well said, ' When the parties covenanted for a first mortgage, it implied a first lien as clearly as if words to that effect had been inserted in the agreement itself. In the plain, ordinary and popular sense, first mortgage means first lien. When railroad bonds are sold in the open market as first-mortgage bonds all persons understand them to be first liens. When we speak of lending money on first mortgage, no thought of anything but a first lien is entertained.' * * * The court is not simply called on to say whether ' mortgage ' and ' lien ' are synonymous. The question is not one of synonyms, nor of technical definitions of words as found in dictionaries. But what does a written contract made in Pennsylvania respecting securities on real estate mean? When it calls for a first mortgage it means one prior to all other liens. When a party gives such mortgage, or sells a bond secured thereby, showing the facts on its face, or when he induces its guarantee as such, unless there be some qualifications expressed, he shall not afterwards set up a lien against the guarantor and holders of the bonds. His plainly-implied contract stands in his way."

The above statement made fifty-five years ago holds good today. It is manifestly not the purpose of one buying a mortgage for investment to buy a law suit or to make a bad investment. The concealment of the fact that a mortgage is in default involves much more than the exact amount in arrears. It involves the question whether plaintiff would have purchased at all if he had known the facts. A mortgage that is in default is in a very different category from one on which all payments have been made as they have accrued. The executive vice-president of the defendant, when asked if the company with his knowledge and consent had sold a mortgage that was in default, answered emphatically, "Absolutely not." When this mortgage was assigned to the Bond and Mortgage Guarantee Company by the defendant preliminary to its sale, the assignment was dated back six months to a time when it was not in default. This transaction indicates defendant's understanding of the status of a mortgage before and after default. An experienced conveyancer called as a witness testified that arrears of taxes were considered a material fact in the sale of a mortgage. This is necessarily so. Default in meeting the terms of a mortgage casts doubt upon the soundness of the security and the responsibility of the debtor.

Circumstances might arise where the default in the payment of taxes was for some short time which had not been noticed by the seller and we do not pass upon the rights of the purchaser in that situation. The present record shows, however, complete documentary knowledge of the arrears and other facts which would indicate that the defendants were attempting to unload on an innocent purchaser the burden of this mortgage. To allow the defendants to accomplish that purpose would frustrate the reasonable expectations of the plaintiff in making its purchase and such a result would have no sound business basis.

But it is urged that the doctrine of *caveat emptor* should be applied in this case because since there are no implied warranties at common law and since there was no fiduciary relationship between the parties, the defendant owed no duty to the plaintiff in the transaction except to refrain from making false statements of facts or resorting to conduct designed and intended to effect the deceit. (*Benz* v. *Kaderbeck*, 241 App. Div. 583.) It is true that ordinarily at common law there were no implied warranties. (*Jones* v. *Just*, L. R. [1867] 3 Q. B. 197.) But when an article was sold by a dealer (*Chanter* v. *Hopkins*, 4 M. & W. 399), or when a buyer purchased on the seller's judgment (*Brown* v. *Edgington*, 2 Man. & G. 279), there were implied warranties. There also was a requirement at common law that an article must be as described. (*Barr* v. *Gibson*, 3 M. & W. 390.)

In the case before us we have a sale of a chose in action by the defendant who was a dealer in the business of buying and selling mortgages. To that extent the defendant was a merchant of mortgages with a stock in trade. The plaintiff demanded a mortgage as an investment. Defendant's custom was to sell mortgages that were not in default. The guaranty which went with the mortgage was a further representation that it was a good mortgage. It is true that purchasers of mortgages up to within a short time have relied on the guaranty. That, however, does not mean that the purchaser thought he was getting a mortgage in default that was guaranteed. On the contrary, the purchaser thought that the mortgage would not be guaranteed unless it was an unusually safe investment. To permit the defendant, a dealer with full knowledge, to say that the buyer has a duty of inquiry is equivalent to setting up a lower standard of business ethics on vendors of mortgages involving the investment of large sums of money than is put as a matter of course upon the ordinary merchant.

Respondent claims also that the court was justified in finding that the failure of plaintiff to make a prompt offer to return the mortgage immediately after April 5, 1933, the date of the discovery

of the default in taxes, was an election to affirm the transaction. It is true that five months elapsed before there was a rescission here. This point might or might not have had merit had it been tried. The defense, however, of ratification, waiver, estoppel or laches, whatever it might have been labelled, was not pleaded and under well-settled rules in this State, such defense must be pleaded to be properly presented. (*Bloomquist* v. *Farson*, 222 N. Y. 375; *Grant* v. *Pratt & Lambert*, 87 App. Div. 490, and *Slayback* v. *Raymond*, 93 id. 326.) As LEVENTRITT, J., wrote in *Slayback* v. *Raymond* (40 Misc. 601): " The court will not invoke the doctrine of laches to offend its own conscience."

The judgment should be reversed, with costs, and judgment should be directed as prayed for in the complaint, with costs.

MARTIN, P. J., UNTERMYER and COHN, JJ., concur.

Judgment reversed, with costs, and judgment directed as prayed for in the complaint, with costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.