In the Matter of the Estate of CHARLES W. LAGEMANN, Deceased.

Surrogate's Court. New York County, March 25. 1942.

*Mitchell, Taylor, Capron & Marsh,* for the City Bank Farmers Trust Company, corporate trustee, petitioner.

*Merritt & Bangs* [*Frederick C. Bangs* of counsel], for Walter Lagemann and Eric Lagemann, individual trustees, petitioners.

*J. Hutton Hinch,* special guardian.

DELEHANTY, S. By decree dated November 3, 1934, the account of the executors was settled. It confirmed the delivery by the executors to the trustees of 7,631 shares of the capital stock of a family holding corporation in which were interested the deceased, his daughter, his two sons and his four grandchildren. These shares owned by the deceased were all held and managed by his trustees until December 28, 1936, when a part of them was liquidated in the manner hereinafter stated. Thereafter the trustees held and still hold 6,662 shares of the corporation. The first account of the trustees was settled by decree dated July 19, 1937. In the account so settled one schedule referred to the shares of the family holding corporation and to transactions of the trustees respecting them. The petition on that accounting referred to this schedule and sought approval of the acts of the trustees. The citation on that account-ing referred both to the liquidation of the shares redeemed and

to the continued holding of the unredeemed trust shares. To the intermediate account resulting in the decree of 1937 no objections were interposed. On the basis of that lack of objection this court signed a decree which settled the account of the trustees. On an application made to resettle the decree the court expressed the view that certain questions were still open in respect of the shares so held by the trustees. (*Matter of Lagemann*, 165 Misc. 747.) It declined to make a decree foreclosing future inquiry.

The trustees now seek an adjudication which will conclude the question which this court in its prior decision deemed still to be open. The citation seeks decision respecting " the right, power and authority of said trustees, under the terms and conditions of said will, to retain and continue to hold in the trust shares of the capital stock of a certain corporation, known as Uplands Corporation." The petition, in different text, seeks the same adjudication. The special guardian has filed two reports, in the second of which he asks leave to file objections on behalf of his infant wards to the retention by the trustees of the shares in controversy if the court shall determine that the transactions of the fiduciaries in respect of the shares altered their quality so as to take them outside the authority to retain deceased's investments granted to the trustees under deceased's will.

The shares in question came into the ownership of deceased in the year 1930 when he caused a Delaware corporation to be organized with the title Uplands Corporation and caused to be transferred to it common and preferred stocks of the market value of $1,452,400. In exchange for these securities the corporation issued to deceased 14,524 shares of the par value of $100 each. Deceased caused 250 of these shares to be distributed to each of his sons and 150 shares to be distributed to each of four grandchildren. The distribution of these 1,100 shares left in the testator's hands 13,424 shares which he continued to hold until his death. Thereafter his daughter and his sons in their individual names procured in the Supreme Court an adjudication that securities transferred to the corporation by deceased included securities owned by the plaintiffs, respectively. In consequence of that adjudication 5,793 shares were issued in varying amounts to the successful plaintiffs, leaving in the estate 7,631 shares. After she received her shares the daughter of deceased pressed her brothers to liquidate them for her and eventually in late 1936 a reduction in capital by one-half was effected to pay her (and the trustees) out. This reduction was possible only because the estate shares were voted for it. There were nominal provisions in the plan for selection by lot of the shares to be redeemed but the record shows

that the actual plan had all been agreed upon in advance of the reduction and that it was put through with the preconceived intention that the daughter of deceased and his two sons should withdraw 100 per cent of their interests in the corporation. The shares owned by the two trustees and their sister were 969 short of the one-half redeemable. Accordingly the trustees of deceased voted by a majority comprised of the sons of deceased to deposit for redemption only this limited number of estate shares. On a *pro rata* redemption trust shares to the number of 3,815 could have been redeemed. Thereby a sum of $390,000 more or less would have been received in marketable value into the trust. Actually less than $100,000 came in. There was a faint-hearted protest by the minority trustee against the determination of the majority but no appeal was made by it to this court for direction to the trustees as a whole. The power of the court to entertain and to act on such an application is unquestionable. (Surr. Ct. Act, § 40.) When the plan was thus effected the two sons of deceased and their sister had received, free of tax liability, securities having a market value in excess of $500,000. Thereafter they were no longer investors in the corporation and were of course able to use the property withdrawn by them, free of any mutuality of hazard in the later dealings of the trustees with estate shares and with the securities underlying them.

The distribution made on the shares redeemed left in the ownership of the corporation in each instance securities identical in description with those delivered on the redeemed shares. The quantity of securities left in the corporation's hands was ratably the amount which the unredeemed shares (those of the estate and of the grandchildren) represented in fractional interest in the whole before redemption. This method of redemption and distribution is argued by the trustees to have effected no change in the investment of the deceased. They say that they now hold and manage precisely the same thing which deceased committed to their management. Whether the position thus taken by the trustees is tenable is the immediate question for decision.

In considering that question the background of the corporation must be taken into account. It seems clear from the record that all of the assets which reached the corporation were originally those of deceased or at any rate the aggregate of his original resources plus the increment which he had built thereon either before or after he had parceled out some of his assets to his children. This totality of family interests was managed by deceased alone prior to the organization of the corporation. He was the attorney in fact for his children and so far as the record shows did not consult

his children respecting his dealings with the entire property. He managed his own and his children's property as if he were the managing partner in a copartnership. When he caused all of the property to be delivered over to the corporation he continued just as before to manage the whole enterprise. The corporate form in one sense emphasizes the combination or integration of the interests of all. Whereas theretofore it could have been said that the respective security ownerships of each were separately identifiable the participations of each in the corporate shares did not give any of them any specific interest in any specific corporate security.

To say as between the parties that the transactions here had some of the aspects of a partnership is not to create a new juridical concept. As was said in *Thomashefsky* v. *Edelstein* (192 App. Div. 368, 369), " * * * equity will disregard the forms of a corporation in certain cases and treat the parties as copartners * * *." Since the question is not one between the corporation and an outsider, there is still room for this court as a court of equity to deal with the relationship as one not wholly impersonal. Whether or not the association between deceased and his children be regarded as a partnership, it is plain that it was an association in which they had common interests when deceased drew his will and when his will became operative. It is against the background of that concept that his will and the authority granted to his trustees are to be viewed.

If the community of personal interests is not obscured by the corporate form, *Matter of Tucker* ([1894] 1 Ch. 724, 733) illustrates the applicable legal principles. The cited case was one which concerned a will authorizing the trustees to place money of a testator on deposit with a particular firm. The testator had been associated with that firm and when he died he had on deposit with it several thousand pounds. The English court obviously considered the authority granted to the trustee to *make* a deposit as the equivalent of an authority to *retain* on deposit money placed with the firm by the deceased himself. The question was whether the trustees had an obligation to withdraw that deposit because the firm as it existed at the testator's death was later changed in personnel. The firm name never changed nor did the firm business. In construing the power granted to the trustees by the testator, the court said: " I think the testator authorized the lending of the money only to the firm * * * as constituted at the date of his death * * *. *Prima facie*, a testator when authorizing by his will a loan to a firm does so because he has faith in and places reliance on the members of that firm as constituted at his death; * * *. This being so * * * it was the duty of the then

trustees, and of the subsequent trustees, to have got the money in, and * * * they committed a breach by not so doing for which they are responsible, * * *."

When persons occupy a trust position good faith as matter of fact may sometimes be held in law bad faith. (*Cox* v. *Stokes,* 156 N. Y. 491, 508.) When the conduct of trustees transcends the boundaries of a legitimate discretion in the conduct of their trust a court is not bound to approve the result merely because the trustees had no evil motive. There was here a conflict between the personal interests of the trustees and their duties as fiduciaries. They resolved that conflict wholly in their own favor. The result of their acts was that they had for administration as trustees something in which they had no personal individual interest; and so had something which differed in vital respects from the property which the deceased authorized them to retain. There has been made here by the acts of the trustees a substantial intrinsic change in the security which they were authorized to retain. While deceased had committed to the care of his trustees a property in which each of them had a personal vital interest their conduct as trustees has eliminated such interest completely. After the change was effected, the trustees were free of all the restraints which a proprietor feels who risks his own capital. They had as beneficiaries only an interest in income. They could deal recklessly or carefully with the capital in their hands without fear of loss except a loss of income. That the risk of speculation became greater the moment the personal capital of the trustees was removed is proved by human experience.

The conclusions here reached make it appropriate that the special guardian shall determine whether or not he shall file objections. The views on the law here expressed do not operate *ipso facto* to charge the trustees with liability. They are to be so charged only if an issue as to their alleged dereliction has been formulated by appropriate objection so that it may be met by them and only if, on such issue, liability is found. If such challenge of their conduct shall be made by appropriate objection, there will be presented the need for determining the area within which the prior decree settling the account of the trustees operates if at all and there will be open also to the trustees the opportunity to litigate on all factual bases any attack made upon their investment policy. The special guardian is given leave to file objections on or before April 3, 1942, if he desires so to do. If objections be filed a hearing date for the trial thereof will be fixed by the court.

Proceed accordingly.