John C. Boylan, S.
In this contested executor’s intermediate account there are two issues which must be resolved before the account can be judicially settled. First, the court must interpret an agreement entered into by a corporation (Uniforms by Ostwald), the decedent and Adolph Ostwald when the individual parties were the equal owners of the corporate stock. The second question that must be decided is whether the provision for alimony payments in a separation agreement entered into between the decedent and his first wife (Anita Ostwald) was to remain in force after his death.
The decedent died on February 21,1956, leaving him surviving a widow, a former wife and a son of the prior marriage. In his will, executed on November 12, 1955, and admitted to probate on May 2, 1956, he nominated his brother (Adolph Ostwald) as executor; the principal beneficiaries were his widow and son.
The decedent and his brother (Adolph) were the founders of and equal owners of the stock of a corporation (Uniforms by Ostwald). On August 24,1955, they entered into an agreement, the preamble to the general provisions thereof set forth the purpose and provided: “ Whereas the individual parties hereto desire to impose restrictions on the transfer * * * disposition or sale of their respective stockholdings in the corporations and to effectuate provisions and conditions contained hereinafter in this agreement”. The agreement then defined their rights in the corporations and provided: “To the end that there shall never be any dispute as to the purchase price to be paid for the stock of any of the parties hereto in Uniforms, * * * it is agreed that the purchase price to be paid for each share of stock pursuant to any of the provisions of this agreement, * * * shall be the last amount fixed as the share value *1003 thereof in Schedule ‘ A ’ hereto annexed. ’ ’ Schedule A set up a price index as to the value of shares of stock.
The parties interested in this proceeding are in disagreement as to the interpretation of subdivision (B) of paragraph 6 which provides as follows: “ All of the terms and provisions of Subdivision ‘(C)’ of paragraph 1 5 ’ hereinabove concerning the method of payment, and the closing with regard to the purchase price shall be followed, # * * the only exception being that in case of death, Uniforms shall pay to the executors or legal representatives of the decedent, an amount equal to the net proceeds of any life insurance policies which it may hold and which insure the life of the decedent. Said payment by Uniforms shall be made promptly upon receipt by Uniforms of the proceeds of said insurance policies. Said payment when made by Uniforms to the executors or other legal representatives of the decedent, shall be applied toward the payment of the first maturing subordinated debenture issued pursuant to this agreement, or in the event that preferred stocks shall have been issued in accordance with this agreement, then such payment shall be made to redeem so much of said preferred stock as the par value shall equal the amount of the said net insurance proceeds.”
At the time of his death, Ernest was the owner of 450 shares of stock of Uniforms by Ostwald Inc. The corporation at that time, was the beneficiary of insurance in the sum of $200,000 on the life of Ernest and $100,000 on the life of Adolph. The executor of the estate of Ernest Ostwald sold the stock to the corporation for $110,263.50 on the theory that Schedule A of the agreement fixed the purchase price per share at $245.03 for all purposes. The widow and son contend that under subdivision (B) of paragraph 6 of the agreement, the entire proceeds of insurance should have been turned over to the estate for the shares of stock owned by the decedent, and seek to surcharge the executor in the sum of $89,736.50.
In construing a written contract the court should place itself in the situation of the parties and determine the meaning and intent of the language employed (Gillet v. Bank of America, 160 N. Y. 549).
As a result of the hearings held, the stipulations entered into and signed by the attorneys for the parties, together with the testimony of Adolph, the court is satisfied that the following are the pertinent facts:
Prior to December of 1954, there were policies of $100,000 of life insurance on each of the lives of Ernest and Adolph, paid for and owned by the corporation. Ernest and Adolph in *1004 December, 1954, obtained additional insurance with a different company in the amount of $100,000 on Ernest’s life and $75,000 on Adolph’s, at cheaper premium rates. The corporation likewise owned and paid all premiums on this additional insurance. The parties agreed that all insurance policies with the initial carrier in excess of $100,000 on the life of Ernest and $75,000 on the life of Adolph were to be discontinued by either procuring a return of premiums paid thereon or through lapse for nonpayment of premiums. In late April or early May of 1955, the initial carrier refused to cancel the policies as requested and refused to return the premiums paid thereon. A short time later, Doctor Cecil Mantell informed Adolph that Ernest was suffering from incurable lung cancer. A few days after Adolph was so informed, the carrier on the initial $100,000 of insurance on Ernest, sent a notice to him, to the effect that it would cancel said insurance unless the premiums were paid before the end of the grace period. Pursuant to the verbal agreement between the parties, the policies on Adolph’s life with the initial carrier were allowed to lapse. Because of Ernest’s condition, contrary to the agreement and unknown to Ernest, the initial policies on Ernest’s life for the benefit of the corporation were continued by Adolph by his paying the premiums on said policies with funds of the corporation. About three months later (in Aug. of 1954), the stockholders’ agreement was executed.
Relative to the question as to whether Ernest was aware, at the time of the execution of the agreement, that there was $200,000 of insurance on his life, or whether he ever became aware of that fact before his death, the court will quote directly from the testimony of Adolph at the second hearing:
“ Q. So that at all times from the signing of the stockholders agreement until the time of the death of Ernest, there was $200,000 worth of insurance on his life in full force and effect? A. That is correct.
“ Q. * * * and there was $200,000 on his life payable to Uniforms from May, 1955, until the time he died, a couple of months before the signing of the stockholders agreement? A. Correct.
“ Q. Is it a fact that from the time of the stockholders agreement Ernest was of the opinion that there was only $100,000 worth of insurance on his life payable to the corporation? A. That would be my opinion, too.
“ Q. Now, did you ever tell him that was not so (referring to Ernest’s opinion that there was only $100,000 of insurance on his life when agreement was signed) ? A. No, I did not.
*1005 “ Q. I said, at the time of the signing of the agreement, Ernest was of the thought that there was $100,000 worth of insurance on his life and $100,000 worth of insurance on your life payable to the corporation? A. That is correct,
‘ ‘ Q. And you also made every effort not to let him know that there was $200,000 worth of insurance on his life? A. 1 made every effort to conceal from Mm that the original insurance was continued.” (Italics supplied.)
From the testimony thus adduced, it is clear that as far as Ernest was concerned, the word “ insurance ” when used in the disputed clause, referred only to policies of $100,000 on the life of each, payable to the corporation, and thus, the court holds that ‘1 insurance ’ ’ as used in the disputed clause refers only to that amount, and that the excess insurance of $100,000 of which Ernest was unaware at the signing of the agreement, does not pass or fall within the purview of the agreement.
A promise is to be interpreted in that sense in which the promisor knew that the promisee understood it (Barlow v. Scott, 24 N. Y. 40; Hoffman v. Ætna Fire Ins. Co., 32 N. Y. 405, 412). Where the promisor has reason to suppose that the promisee understands the ambiguous promise in a particular sense, that meaning will be adopted by the court in construing the contract (Nellis v. Western Life Ind. Co., 207 N. Y. 320, 332).
In order to arrive at a proper construction or interpretation of the disputed clause in the stockholders’ agreement, the court must consider the rules of law hereinabove referred to, and cannot construe it so as to give full force and effect to something which Ernest never had in mind. This is especially true where the agreement is ambiguous. Furthermore, when the parties in the disputed clause stated that “ such payment shall be made to redeem so much of said preferred stock as the par value shall equal the amount of said net insurance proceeds ” (italics supplied) they indicated that the insurance proceeds were less than the value of the stock and gave significance to the term “net insurance proceeds,” and would cause one to conclude that the parties in using the words “ net proceeds ” in line eight of the disputed clause had in mind Schedule A and that there was $100,000 of insurance on the life of each.
Thus when reading the contract in the light of the facts as shown, the court is of the opinion that the contract should be construed so as to mean that the parties intended, that should one of the brothers die, the price of the stock was the figure set forth in Schedule A ($245.03 per share or $110,263,50), which *1006 price would be paid at least in part with the proceeds of those policies of which both were cognizant.
The primary purpose of having insurance ($100,000 on the life of each payable to the corporation), was to enable the corporation to have sufficient cash on hand to redeem the bulk of stock of the one who died, and also to enable the surviving stockholder to acquire complete corporate control (Greater New York Carpet House v. Herschmann, 258 App. Div. 649).
Having therefore determined that the price of the stock is $110,263.50 and that insurance proceeds in the amount of $100,000 were to be used by the corporation to purchase the outstanding shares of a deceased stockholder, the court must now decide to whom the excess insurance proceeds are payable. Since both the objectants and Adolph in their pleadings indicate that the amount in dispute is $89,736.50 and since $10,263.50 of the excess insurance has been turned over to the estate in payment of the stock of Ernest, the court will confine its decision to the amount claimed to be in dispute pursuant to the provisions of such pleadings.
The court is satisfied from the uncontradicted testimony of Adolph, that one of the reasons he continued the original insurance on Ernest’s life, was because he feared that, should the original insurance on Ernest lapse, and thereafter, and within the contestable period of the latter policy, should the company refuse to pay the proceeds under the subsequent policy, conceivably there might be no insurance proceeds with which the corporation could purchase the outstanding shares of Ernest. No doubt, Adolph by his actions was protecting his own interest and indirectly the corporation’s and Ernest’s. However, it does not follow that because all the proceeds of insurance were in fact received, including the proceeds on those policies on Ernest’s life which the latter was lead to believe had lapsed, that Adolph or his alter ego, “ Uniforms by Ostwald ” should receive a windfall of nearly $90,000.
In considering the distribution of the excess proceeds of insurance, the court, under its equity powers may look into the background of the corporation (Matter of Auditore, 249 N. Y. 335; Matter of Lagemann, 178 Misc. 352, 354).
It is incumbent upon this court to render a complete and final decision in the proceeding before it. Such action by this tribunal would obviate the necessity of the parties reappearing in a similar type application or a collateral issue arising therefrom.
Section 40 of the Surrogate’s Court Act requires this court “ To administer justice in all matters relating to the affairs of *1007 decedents, and upon the return of any process to try and determine all questions, legal or equitable, * # * in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires.”
The record indicates that “ Uniforms by Ostwald ” was what is commonly referred to as a “ closed ” or “ family ” corporation, and that Ernest and Adolph ran the firm in effect, as copartners. This is indicated by Adolph’s testimony when he referred to the stockholders’ agreement as a “ partnership agreement.” To say, therefore, as between the parties, that the transactions had some of the aspects of a partnership is not to create a new juridical concept. Since the question is not between the corporation and an outsider, this court in an application of its equitable jurisdiction disregards the corporate form, deals with the relationship as one not wholly impersonal and treats the parties as copartners (Thomashefsky v. Edelstein, 192 App. Div. 368, 369; Matter of Lagemann, 178 Misc. 352, 353, supra).
In determining what is fair and equitable under the circumstances, the court must take into account, that if it were not for Adolph’s foresight in continuing the insurance, the objectants would have had no reason to raise objections because there would have been no excess insurance proceeds available. Thus to rule that $89,736.50 should be awarded to the estate would seem to be inequitable since the effect of such a determination would be to penalize Adolph for having been instrumental in continuing in force the first $100,000 of insurance. On the other hand it is undeniable that funds of the “ closed ” corporation, half of which belonged to Ernest, were used to pay the premiums on the original policies in order that such be continued. Furthermore it would seem that Adolph, whatever his motives, violated sections 27 and 28 of the General Corporation Law of the State of New York. Section 27 provides in part: “ Unless otherwise provided a majority of the board at a meeting duly assembled shall be necessary to constitute a quorum for the transaction of business ”.
Section 28 provides: “ Whenever, under the provisions of any corporate law a corporation is authorized to take any action by its directors, action may be taken by the directors, regularly convened as a board, and acting by a majority as a quorum, except when otherwise expressly required by law or by the by-laws and any such action shall be executed in behalf of the corporation by such officers as shall be designated by the board. *1008 Any business may be transacted by the board at a meeting at which every member of the board is present, though held without notice.”
It is evident that when Adolph and Ernest agreed to permit the initial insurance to lapse a valid corporate meeting of the board of directors is deemed to have been held under the aforementioned statutes. Where a corporation is composed of a small number of persons, they may transact all their business by conversation without formal votes (Hall v. Herter Bros., 83 Hun 19). However, the steps taken by Adolph in continuing the original insurance contrary to the verbal agreement, cannot be deemed to have been a valid act of the board of directors under the statutes, since Ernest, the other director, was not given any notice that the insurance was to be continued and never ratified Adolph’s unilateral actions. In fact, Ernest never knew the insurance referred to was continued.
The court is of the opinion, therefore, that because each of the parties in effect paid half of the premiums on the original insurance, since each was 50% owner of the “ closed ” or “ family ” corporation, the estate should have a trust impressed upon 50% of the proceeds of insurance or $44,868.25 (Holmes v. Gilman, 138 N. Y. 369, 385; Dayton v. Claflin Co., 19 App. Div. 120; Coffin v. Shour, 246 App. Div. 263; Matter of Clark, 69 Misc. 527, 530; Cohen v. Tefft, 51 N. Y. S. 2d 106).
It is Adolph’s contention, that assuming the theory relative to the tracing of the amount of premiums to the insurance proceeds and allowing the estate a prorata share thereof, is applicable, in determining the proportion of the proceeds to which the estate is entitled, the court must only take into account those payments of premiums made in derogation of the verbal agreement, and allow the estate such proportion of the proceeds of insurance as one half of the unauthorized payments bear to the total amount of premium payments. In effect, Adolph argues that since the premium payments made before the verbal agreement were authorized, only he and the corporation should receive the benefits of such payments, when fixing the amount the estate should receive.
To engage in this logic is sophistry and untenable and would grant Adolph an unfair advantage for having breached the oral agreement regarding the original insurance.
In the absence of an express agreement to the contrary, it is presumed that Adolph and Ernest had an equal interest in the corporation and it cannot be held that they presumed an unequal *1009 division of the corporation’s property, profits, or increments (Van Name v. Van Name, 38 App. Div. 451).
Since the court has determined that a trust should be impressed upon the proceeds of insurance in the sum of $44,868.25, the executor, because of the foregoing is surcharged in the same sum.
As to the issue regarding the continuance of alimony payments, the following facts are pertinent:
The former wife divorced the decedent in 1952. Prior thereto she and the decedent had entered into a separation agreement. It is her contention that the provisions for alimony in the separation agreement survive the decedent and seeks to have the executor set aside the sum of $60,021 as a reserve fund to meet her claim against the estate. This sum represents the probable amount of alimony that she would be entitled to, based on her life expectancy under the American Experience Table of Mortality.
The agreement provides that the decedent was obligated to pay her $325 per month, “ said monthly payments required to be made by the husband under this paragraph shall terminate upon the remarriage of the wife or upon her death,” and further that ‘ ‘ to secure the payment to the wife of said $325.00 monthly payments in the event that the husband predeceased the wife had agreed to name the wife the irrevocable beneficiary ” under two life insurance policies aggregating $25,000. At the time of decedent’s death there were two policies aggregating such sum in which the former wife was named beneficiary. The policies provide that in the event of the death of the decedent, the wife is to be paid the sum of $325 monthly until her death.
Although-the general premise is that alimony payments cease on the death of the husband (Wilson v. Hinman, 182 N. Y. 408), it will yield where he voluntarily assumes an obligation to provide payments after his death and such an agreement to provide for the wife’s support for her lifetime does not terminate upon the death of her husband and binds his estate (Barnes v. Klug, 129 App. Div. 192; Matter of Grimley, 200 Misc. 901; Matter of Rabinowitz, 201 Misc. 896). The deceased made such a contract and he obligated his estate to continue monthly payments to his former wife until her remarriage, or until her death, whichever event occurred first.
The former wife as a creditor of the estate is entitled to have her claim secured, and the sum of $60,021 ($35,021 from the estate plus $25,000 of insurance proceeds) should be sufficient for that purpose.
*1010 Since both the alimony agreement and the policies provide that monthly payments of $325 should be made from the $25,000 of insurance proceeds, then that source should be exhausted before any payments are made from the $35,021 which the estate will have to place in this reserve fund. Said fund, so far as the amount in excess of the $25,000 of insurance proceeds is involved, will be administered by a trustee appointed for that purpose, and on the death of the former wife, or her remarriage, the unexpended balance will be payable in accordance with the provisions of the will, the separation agreement, and the insurance policies as determined herein.
The court, having determined that the alimony payments survived the death of the decedent, the former wife as a creditor, is not chargeable with any inheritance taxes. In so holding the court in no way intends that the taxing authorities be bound hereby for the reasons that the Federal and State Tax Commissions are not parties to this proceeding, and it is not within the province of the court to determine a matter of taxation prior to a fixation by the two mentioned authorities.
Submit decree judicially settling the account on notice and in accordance herewith.